# EXHIBIT X

*HICKEY FREEMAN TAILORED CLOTHING, INC. VS.*
*CHARGEURS, S.A., et al*

*ALAN ABRAMOWICZ 30(b)(6)*
*June 25, 2018*
*Confidential*



**ELLEN GRAUER**
COURT REPORTING CO. LLC

126 East 56th Street, Fifth Floor  New York, New York 10022
P: 212-750-6434   F: 212-750-1097
www.ellengrauer.com

*Original File 117779.TXT*
*Min-U-Script® with Word Index*

## Page 1

```
 1    IN THE UNITED STATES DISTRICT COURT
 2    FOR THE SOUTHERN DISTRICT OF NEW YORK
      ------------------------------------------------x
 3    HICKEY FREEMAN TAILORED CLOTHING, INC.,
 4                    Plaintiff,
 5       -against-
 6    CHARGEURS, S.A., LAINIERE DE PICARDIE BC SAS,
      LANIERE DE PICARDIE INC., LAINIERE DE PICARDIE
 7    (WUJIANG) TEXTILES CO. LTD, AND VERATEX LINING
      LTD.
 8
                      Defendants.
 9
      Case No.:  17-cv-5754(KPF)
10    ------------------------------------------------x
11
12          * * * C O N F I D E N T I A L * * *
13
14                   101 Park Avenue
                     New York, New York
15
                     June 25, 2018
16                   9:15 a.m.
17
18       Deposition of Plaintiff by ALAN ABRAMOWICZ,
19    taken pursuant to 30(b)(6) Notice, before Rita
20    Persichetty, a Notary Public of the State of New
21    York.
22
23          ELLEN GRAUER COURT REPORTING CO., LLC
              126 East 56th Street, Fifth Floor
24               New York, New York 10022
                       212-750-6434
25                   REF:  117779
```

## Page 2

```
 1   A P P E A R A N C E S:
 2
 3   LOEB & LOEB LLP
 4   Attorneys for Plaintiff
 5       345 Park Avenue
 6       New York, New York 10154-1895
 7   BY:  FRANK D. D'ANGELO, ESQ.
 8       PHONE:  212.407.4189
 9       FAX:  212.504.3264
10       EMAIL:  fdangelo@loeb.com
11
12
13   FOX ROTHSCHILD LLP
14   Attorneys for Defendants Chargeurs and
15   Lainiere de Picardie
16       101 Park Avenue, Suite 1700
17       New York, New York 10178
18   BY:  CAROLINE A. MORGAN, ESQ.
19       WILLIAM H. STASSEN, ESQ.
20       PHONE:  212.88.7900
21       FAX:  212.692.0940
22       EMAIL:  cmorgan@foxrothschild.com
23
24
25
```

## Page 3

```
 1   A P P E A R A N C E S: (Cont'd)
 2
 3   WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
 4   Attorneys for Defendant Veratex
 5   1010 Washington Boulevard
 6   Stamford, Connecticut 06901
 7     BY: ERIC W.F. NIEDERER, ESQ.
 8     PHONE: 203.388.9100
 9     FAX: 203.388.9101
10     EMAIL: eric.niederer@wilsonelser.com
```

## Page 4

```
 1   ----------------- I N D E X -----------------
 2   WITNESS                EXAMINATION BY        PAGE
 3   ALAN ABRAMOWICZ        MS. MORGAN               5
 4
 5
 6   --------- INFORMATION/DOCUMENT REQUESTS ---------
 7   PAGE:    37    G9 meeting minutes
 8
 9
10   --------------- E X H I B I T S ---------------
11   DEFENDANTS     DESCRIPTION                FOR I.D.
12   Exhibit 1      Complaint                         9
13   Exhibit 2      Deposition Notice                72
14   Exhibit 3      Revised Deposition Notice        72
15   Exhibit 4      E-mail dated April 20,          262
16                  2017
17   Exhibit 5      A document                      268
18   Exhibit 6      Fabric Construction Detail      272
19                  Sheet
20   Exhibit 7      Invoice                         274
21   Exhibit 8      General sewing data             283
22                  document
23   Exhibit 9      E-mails                         291
24
25           (EXHIBITS TO BE PRODUCED)
```

Case 1:17-cv-05754-KPF   Document 78-24   Filed 08/17/18   Page 4 of 10

HICKEY FREEMAN TAILORED CLOTHING, INC. vs. Confidential
CHARGEURS, S.A., et al
ALAN ABRAMOWICZ 30(b)(6)
June 25, 2018

Page 45

1  ABRAMOWICZ - CONFIDENTIAL
2  entry and all the different aspects of the
3  operations of the business.
4      MR. D'ANGELO: Can we take a brief
5  break, please?
6      MS. MORGAN: Sure.
7      (Short recess taken.)
8  Q.  Mr. Abramowicz, do you understand
9  that you're still under oath?
10 A.  Yes.
11 Q.  While at Hickey Freeman, is any part
12 of your job to provide legal advice?
13 A.  No.
14 Q.  Have you ever heard of an entity
15 called Chargeurs S.A.?
16 A.  I've heard of Chargeurs.
17 Q.  When on -- have you heard
18 specifically of an entity called Chargeurs
19 S.A.?
20     MR. D'ANGELO: You mean outside the
21 context of this litigation?
22 Q.  At any point in time.
23 A.  In the context of the litigation, I
24 have.  Outside the context of the litigation, I
25 had not.

Page 46

1  ABRAMOWICZ - CONFIDENTIAL
2  Q.  When you said that you have heard of
3  Chargeurs, can you tell me what you meant by
4  that?
5  A.  Chargeurs is a supplier of
6  interlining and other products.
7  Q.  What -- to Hickey Freeman or to whom?
8  A.  To Samuelsohn and Hickey Freeman.
9  Q.  What other products other than
10 interlining?
11 A.  I don't know all the other products.
12 I just know that they claim to be a supplier of
13 product, but what we buy is interlining.
14 Q.  Do you have any idea of what other
15 types of products --
16 A.  No.
17 Q.  -- that they may or may not supply?
18 A.  No.
19 Q.  Does Hickey Freeman have any business
20 relationship with Chargeurs S.A.?
21     MR. D'ANGELO: Objection.
22     You can answer, Mr. Abramowicz.
23 A.  They buy interlinings from -- through
24 its agent, being Veratex.  They buy product,
25 the Chargeurs product.

Page 47

1  ABRAMOWICZ - CONFIDENTIAL
2  Q.  Let's go to Exhibit 1, please, if you
3  can take a look at that.  I'm going to ask you
4  questions about the first page, but to the
5  extent you want to look at anything else on
6  this exhibit, you can.
7  A.  Sure.
8  Q.  And when you've had an opportunity to
9  review, please let me know.
10     MR. D'ANGELO: You want him to take a
11 look at the whole document?
12 Q.  I'm only going to ask you about the
13 first page.
14     MR. D'ANGELO: The summons?
15     MS. MORGAN: Yes.
16 A.  Okay.
17 Q.  Have you seen this document before,
18 prior to me putting it before you today?
19     MR. D'ANGELO: You're asking him
20 about the summons or the complaint or
21 both?
22     MS. MORGAN: The summons and the
23 complaint.  This is Exhibit 1 I'm
24 referring to.
25 A.  Yes, I've seen.

Page 48

1  ABRAMOWICZ - CONFIDENTIAL
2  Q.  And to make it easier for a reference
3  point, let's go ahead and turn to the
4  complaint --
5  A.  Okay.
6  Q.  -- which starts on page three of this
7  exhibit.
8  A.  Yes.
9  Q.  Mr. Abramowicz, is this the complaint
10 that Hickey Freeman Tailored Clothing, Inc.
11 filed?
12 A.  I'd say yes.
13 Q.  Okay.  Going into the caption
14 where -- you see where it has Hickey Freeman
15 Tailored Clothing, Inc., plaintiff, against
16 various names that are called "defendants"?
17 A.  Yes.
18 Q.  Okay.  Let's go to the first one,
19 Chargeurs S.A..
20 A.  Yes.
21 Q.  Do you have any knowledge about what
22 Chargeurs S.A. does or where it's located?
23 Anything like that?
24     MR. D'ANGELO: Objection to form.
25     You can answer.

Case 1:17-cv-05754-KPF  Document 78-24  Filed 08/17/18  Page 5 of 10

| HICKEY FREEMAN TAILORED CLOTHING, INC. vs. | ALAN ABRAMOWICZ 30(b)(6) |
| --- | --- |
| CHARGEURS, S.A., et al | June 25, 2018 |

Page 49

1  ABRAMOWICZ - CONFIDENTIAL
2  A.  From a legal perspective?
3  Q.  I'm asking for your -- for Hickey
4  Freeman's knowledge.  I'm not asking you for a
5  legal analysis.
6  A.  Right.
7  Q.  What does Hickey Freeman know about
8  Chargeurs S.A, if anything?  And that can
9  include, you know, even where it's located,
10  things of that nature.
11      MR. D'ANGELO:  I'm going to instruct
12  the witness to exclude from his answer
13  anything he may have learned from counsel
14  or any legal advice he may have received
15  from counsel.
16  A.  So I wouldn't know anything other
17  than -- I wouldn't have known anything other
18  than Chargeurs as the supplier of interlining.
19  Q.  Do you know where Chargeurs S.A. is
20  located?
21  A.  Other than learning from --
22      MR. D'ANGELO:  Yeah.  I assume you're
23  going to ask a number of questions about
24  the complaint, right?
25      MS. MORGAN:  I'm getting to just the

Page 50

1  ABRAMOWICZ - CONFIDENTIAL
2  defendants right now.
3      MR. D'ANGELO:  So you're going to get
4  a similar objection from me in response to
5  a number of these questions which is I'm
6  going to instruct the witness that
7  anything he may have learned from counsel,
8  any discussions that Hickey Freeman may
9  have had with counsel in connection with
10  preparing the complaint and filing the
11  complaint, I'm going to instruct the
12  witness to exclude that material from his
13  answer.
14      To the extent there's any independent
15  knowledge that the witness has as to what
16  Chargeurs S.A. does, then he can answer
17  the question in that regard.
18      MS. MORGAN:  And is that -- does that
19  instruction also apply to facts that are
20  not counsel's mental impressions or
21  anything of that nature?
22      I'm not interested in knowing your
23  legal theories.  I'm interested in what
24  facts he may know about.
25      MR. D'ANGELO:  Right.  I'm sure you

Page 51

1  ABRAMOWICZ - CONFIDENTIAL
2  understand it starts to bleed over when
3  you talk about conversations that counsel
4  and Hickey Freeman had in preparing the
5  complaint.  So I think you should be
6  really precise with the question that you
7  asked.
8  Q.  My question is do you know where
9  Chargeurs S.A. is located?
10      MR. D'ANGELO:  I'll advise the
11  witness he should feel free to review the
12  complaint to the extent that would be
13  helpful in having him answer the question.
14  A.  I always thought the company was a
15  French company from France.
16  Q.  When did you begin to believe that?
17  A.  I would attend the IACDE meeting,
18  International Association of clothing Designers
19  and Executives meetings for the last number of
20  years, and Chargeurs always had a booth at
21  these events, annual conventions.  And it was
22  my impression that Chargeurs was a French
23  company.
24  Q.  So is it your understanding that
25  Chargeurs S.A. attended the IACDE?

Page 52

1  ABRAMOWICZ - CONFIDENTIAL
2  A.  Yes.
3  Q.  Did you ever meet anybody from
4  Chargeurs S.A?
5  A.  Yes.
6  Q.  Who did you meet?
7  A.  I met Francois Russo; Alexandre -- I
8  forget his last name -- Marlien.  I would have
9  met with at the booth some of their
10  representatives that sell interlining, and I
11  would see, as well, Barry Diamond and Fran
12  Natale.
13  Q.  Do you know who Barry Diamond is
14  employed by?
15  A.  Yes.
16  Q.  Who?
17  A.  Veratex.
18  Q.  Are all the other individuals that
19  you listed people that you believe were
20  employed by Chargeurs S.A.?
21  A.  Yes.  No, Fran Natale -- he is
22  located in the United States.
23  Q.  Do you know who he's employed by?
24  A.  Now I do, through the litigation.
25  But a company, a company in the US.

Page 53

ABRAMOWICZ - CONFIDENTIAL
Q. When you met --
A. That's my understanding. It's not my -- I don't know where he's being paid. So I should refrain. I think he's being paid by a company in the U.S., but I don't know.
Q. Is that company one of the defendants listed on the complaint, to your knowledge?
A. Well, on the company it says Lainiere de Picardie, Inc, Lainiere U.S.
Q. I'm referring to the caption which is the box.
A. I would not have known which of these companies he was employed by.
Q. When you met Fran Natale at the IACDE, what was your belief as to who he was employed by, if you had any idea?
A. I just thought he was a representative of -- those years that I would meet him, of Chargeurs.
Q. When you say "Chargeurs," are you talking about the company that you believe is in France?
MR. D'ANGELO: Objection to form.
You can answer.

Page 54

ABRAMOWICZ - CONFIDENTIAL
A. Yes.
Q. This complaint is about interlining that Hickey Freeman alleges is defective. Would you agree with that?
A. Yes.
Q. Do you -- does Hickey Freeman know who manufactured the interlining?
MR. D'ANGELO: Again, I'll instruct the witness, you know, to the extent he has any independent knowledge of this and that Hickey Freeman has any independent knowledge of this apart from any investigation in preparing the complaint or any investigation as part of the litigation, he can answer the question. To the extent it involves those matters, he should exclude that from his answer.
A. Then I would not.
Q. Sir, do you understand that these -- the questions I'm asking are directed towards you?
A. Correct.
Q. Okay. So I've noticed that you have looked at your counsel the last couple

Page 55

ABRAMOWICZ - CONFIDENTIAL
questions. I don't know what the purpose of that is, but the purpose of this deposition is for me to ask you questions and for you to answer them. And your counselor is free to object when he sees fit. However, it's not a team or joint effort.
MR. D'ANGELO: I'm going to take issue with that instruction. At no time have I provided any guidance or answers to the witness. The witness might have glanced in my direction, but I haven't been saying anything or even changing my facial expressions.
So to the extent that counsel for Chargeurs is trying to imply that there's anything amiss here or that there's any wrongdoing, it's absolutely inaccurate.
BY MS. MORGAN:
Q. Did you understand the point that I was making, Mr. Abramowicz?
A. Yes, yes.
Q. The supplier that you were referencing before of the interlining, what is the entity you meant by "supplier," if any?

Page 56

ABRAMOWICZ - CONFIDENTIAL
MR. D'ANGELO: Objection to the form.
You can answer, Mr. Abramowicz.
A. That Chargeurs would be the supplier of the interlining.
Q. When you say -- when you use the term "supplier," is that a synonym for "manufacturer"?
A. Yes.
Q. And when you say "Chargeurs," are you referring back to the entity that is located in France?
MR. D'ANGELO: Objection to form.
You can answer.
A. Yes.
Q. Going back to the caption we were talking about, the next defendant called Lainiere de Picardie BC SAS, do you see that entity?
A. Yes.
Q. Do you have any knowledge about that entity? Let's start out with where it's located.
A. Again, no.
Q. Do you know what that entity is in

Case 1:17-cv-05754-KPF   Document 78-24   Filed 08/17/18   Page 7 of 10
HICKEY FREEMAN TAILORED CLOTHING, INC. Confidential
CHARGEURS, S.A., et al
ALAN ABRAMOWICZ 30(b)(6)
June 25, 2018

Page 57

ABRAMOWICZ - CONFIDENTIAL

the business of doing, if anything?
   MR. D'ANGELO: And again, I'm going to instruct the witness that to the extent he has any independent knowledge that he can answer it, but if he learned anything through counsel -- through counsel's investigation in preparing the complaint or over the course of litigation, he should exclude that from his answer.
   But with that caveat, you can answer, sir.
A. Okay. So no.
Q. Looking at all the parties that are labeled as defendants -- that's Chargeurs, S.A., Lainiere de Picardie BC SAS, Lainiere de Picardie, Inc., Lainiere de Picardie WuJiang Textiles Company, Limited, and Veratex Lining, Limited -- prior to filing this lawsuit, did you know where any of them were located?
A. Veratex.
Q. Where is Veratex located?
A. In Montreal; Quebec, Canada.
Q. The individual Francois Russo that you referenced before that you've met before at

Page 58

ABRAMOWICZ - CONFIDENTIAL

the IACDE --
A. Correct.
Q. -- do you know who he's employed by?
   MR. D'ANGELO: Objection. Asked and answered.
   You can answer.
A. Chargeurs.
Q. When you say "Chargeurs," do you mean Chargeurs S.A. that you said is located in France?
   MR. D'ANGELO: Objection to form.
   You can answer.
A. Yes.
Q. Does Hickey Freeman have any contract with Chargeurs S.A. from 2013 to present day?
   MR. D'ANGELO: I'll object to the question to the extent it calls for a legal conclusion.
   But if the witness has a lay understanding as to what a contract is, what it consists of, he can answer the question in that regard.
A. Well, we would have open POs for the purchase of interlining, and such POs were

Page 59

ABRAMOWICZ - CONFIDENTIAL

directed through its agent, being Veratex. And as such, it would have a relationship with Chargeurs as well, contractural relationship of opening POs.
Q. Is there any contract where Chargeurs, S.A. is a party and Hickey Freeman is a party?
   MR. D'ANGELO: Objection. Asked and answered.
   But you can answer, Mr. Abramowicz.
A. They're not directly a party. But we have a relationship and a contract with them through their agent, being Veratex.
Q. Has Hickey Freeman ever bought anything from Chargeurs S.A.?
   MR. D'ANGELO: Objection to form.
   You can answer.
A. Not directly from Chargeurs, but through its distributor agent.
Q. Is Hickey Freeman's position that Veratex is the agent of each defendant in this lawsuit?
A. It's our position that Veratex is the agent of Chargeurs.

Page 60

ABRAMOWICZ - CONFIDENTIAL

Q. And is that Chargeurs the entity that is in France or some other entity?
   MR. D'ANGELO: Objection to form. Lack of foundation.
   But you can answer.
A. Yes.
Q. Is it Hickey Freeman's position that Veratex is the agent of Lainiere de Picardie, Inc.?
   MR. D'ANGELO: Objection to form.
   You can answer.
A. Can you repeat the question?
Q. Sure. Is it Hickey Freeman's position that Veratex is the agent of Lainiere de Picardie, Inc.?
   MR. D'ANGELO: Objection to form.
   You can answer.
A. No.
Q. Is it Hickey Freeman's position that Veratex is the agent of Lainiere de Picardie Wujiang Textiles Company, Limited?
   MR. D'ANGELO: Objection to form.
   You can answer.
A. No.

Page 97

ABRAMOWICZ - CONFIDENTIAL
 2  Is that a fair --
 3  A. When I would --
 4     MR. D'ANGELO: Objection to form.
 5     You can answer.
 6  Q. Is that a fair understanding?
 7  A. When I was at the meetings, whether
 8  they're short meetings or not, it's always the
 9  question of, "Are you sure this stuff is going
10  to stick? Are you sure it's going to perform?"
11  And that's the discussions. It's about the
12  weight and whether it's going to stick.
13     And everybody would talk about it and
14  everybody would say, yes, it's going to work.
15  These are the parameters. This is how you have
16  to use it. And that's the technical part of
17  it. But it's going to work, meaning it's good
18  go to stick.
19  Q. Do you know what strike-back is?
20  A. Yes.
21  Q. What is it?
22  A. That's when the glue, as opposed to
23  just being on one side and sticking to the
24  fabric, somehow permeates onto the backside of
25  the interlining and the glue is on the other

Page 98

ABRAMOWICZ - CONFIDENTIAL
 2  side.
 3  Q. Did Barry Diamond make any
 4  recommendations concerning strike-back in the
 5  2014 and 2015 meetings with regard to the 630?
 6     MR. NIEDERER: Objection to form.
 7  A. Strike-back wasn't truly brought up.
 8  Q. Was it a little bit?
 9  A. Not that I remember.
10  Q. Regarding strike-back, did anybody
11  from either Chargeurs or Hickey Freeman
12  communicate to Hickey Freeman that the 630
13  would not cause strike-back?
14     MR. D'ANGELO: Did anyone from Hickey
15  Freeman communicate to Hickey Freeman?
16     MS. MORGAN: No.
17  Q. I said, did anybody from Chargeurs or
18  Veratex communicate to Hickey Freeman that the
19  630 would not cause strike-back?
20     MR. D'ANGELO: Objection to form.
21     You can answer.
22  A. I'm not aware of any specific
23  communication to any particular person that the
24  630 would not cause strike-back. However, I
25  have seen on the website that they do refer to

Page 99

ABRAMOWICZ - CONFIDENTIAL
 2  now the 630 as being a product of superior --
 3  or their product of superior quality and
 4  technology, that strike-back is not something
 5  that they experience.
 6  Q. To understand your testimony of what
 7  you saw on the website, did that specifically
 8  refer to 630?
 9  A. No. Could I correct that answer?
10  Q. Yes.
11  A. Not to my recollection.
12  Q. As to what?
13  A. That it specifically applied to 630.
14  Q. The website?
15  A. Correct.
16  Q. Did anybody from Veratex or any
17  Chargeurs entity communicate to Hickey Freeman
18  that the interlining would satisfy the highest
19  quality control standards?
20     MR. D'ANGELO: Objection to form.
21     You can answer.
22     I'm still not clear whether you're
23  asking for specific words or substance.
24     If you understand the question, you
25  can answer.

Page 100

ABRAMOWICZ - CONFIDENTIAL
 2  A. Could you repeat the question? I
 3  just want to get it right, please.
 4  Q. Sure.
 5     MS. MORGAN: Read it back.
 6     (Record read.)
 7     MR. D'ANGELO: Objection to form.
 8     You can answer.
 9  A. Yes.
10  Q. And who was that and when?
11     MR. D'ANGELO: Objection to form.
12  Compound.
13     You can answer.
14  A. During the discussions with Barry.
15  And to the extent that we were going to be
16  using this interlining for our high-quality
17  garments, it was communicated that that product
18  would work as intended and it would not be
19  defective in any which way.
20  Q. So was that communicated by Barry
21  Diamond are you saying?
22     MR. D'ANGELO: Objection to form.
23     You can answer.
24  A. Yes. But also by Chargeurs.
25     And now I'll go back to the IACDE

Case 1:17-cv-05754-KPF Document 78-24 Filed 08/17/18 Page 9 of 10

HICKEY FREEMAN TAILORED CLOTHING, INC. vs. Confidential
CHARGEURS, S.A., et al

ALAN ABRAMOWICZ 30(b)(6)
June 25, 2018

Page 101

1  ABRAMOWICZ - CONFIDENTIAL
2  conferences. Chargeurs has over the years been
3  a major sponsor of the IACDE conferences, and
4  they always have somebody representing and
5  presenting a speech regarding their products.
6  They have their booth in the
7  marketplace regarding their products, on their
8  website regarding their products. And it's
9  always the same and consistent. They're top in
10 their field. They provide the best quality,
11 newest technology and that the product is --
12 performs as needed.
13     So it's not just from Barry Diamond.
14 Chargeurs is always stating that that's what
15 they stand for, that they're one of the leaders
16 in the industry and that they're supposed to be
17 providing that kind of product to us.
18 Q. When you were at the IACDE and you
19 visited these booths that you are referencing,
20 did you ever take any materials in your
21 possession?
22     MR. D'ANGELO: Objection to form.
23     You can answer.
24 A. They didn't give it to me, no. Or if
25 they showed it to me, they showed me the

Page 102

1  ABRAMOWICZ - CONFIDENTIAL
2  materials along with the technical designer
3  that I would have at the conference with me.
4  But I didn't personally take any materials with
5  me.
6  Q. Did the technical designer take any
7  with him or her?
8  A. I don't recall. I would think not.
9  If they wanted to meet up with our technical
10 designers, they would do that when they
11 returned back to the United States.
12 Q. During 2014 and 2015, did Hickey
13 Freeman describe at all to Veratex what it
14 wanted to use the interlining for specifically?
15 Maybe certain types of fabric, maybe certain
16 types of men's suit line, for example. That's
17 my question to you.
18     MR. D'ANGELO: Objection. Asked and
19 answered. I think we've been over all of
20 this.
21     You can answer.
22 A. Yes.
23 Q. And can you describe what specific
24 use, if any --
25     MR. D'ANGELO: Objection.

Page 103

1  ABRAMOWICZ - CONFIDENTIAL
2  Q. -- that Hickey Freeman provided to
3  Veratex for the 630?
4     MR. D'ANGELO: Objection. Asked and
5  answered.
6  A. Absolutely. The discussions between
7  Barry and our technical designers and our
8  buying team would be describing exactly what
9  the use was for, as well as Barry would come
10 into the factories and see exactly what the
11 product would be used for.
12     Barry is very, very knowledgeable of
13 our industry, and he knows exactly what the
14 interlining would be used for. So the
15 discussions would be on the type of fabrics.
16 Specifically, Barry knew that it would be on
17 lightweight fabrics under 240 grams, the
18 purpose of the interlining and understanding
19 the testing process, being us making samples
20 and seeing how the garments looked and what
21 type of fabrics. He was fully informed.
22 Q. Now, the lightweight fabrics under
23 240 grams, is that a policy that Hickey Freeman
24 has with regards to when it uses interlining?
25     MR. D'ANGELO: Objection to form.

Page 104

1  ABRAMOWICZ - CONFIDENTIAL
2     You can answer.
3  A. Yes.
4  Q. When was that policy adopted?
5  A. With us, we started using the
6  interlining, I would say, in 2015 once we
7  started purchasing it from Barry because we
8  have to establish guidelines as to when we
9  would use it. We didn't want to use it just in
10 all fabrics across the board. We only wanted
11 to use it in lightweight fabrics.
12 Q. That's what light weight is? Under
13 240 grams?
14 A. Correct. Our standard, the standard
15 established within Hickey Freeman, as well as
16 in with Samuelsohn.
17 Q. Do you know who came up with that
18 standard, if anybody, specifically?
19 A. Yes.
20 Q. Who is that?
21 A. It's a combination between our
22 technical designers being Rolf van Overdijk, in
23 part Paul Farrington, as well as our
24 merchandising team which was at that time Daryl
25 Hanson who is our lead merchandiser. And so

Page 253

1  ABRAMOWICZ - CONFIDENTIAL
2  customer asks us to take it back as a result of
3  a quality issue, we would.
4  Q.  In Hickey Freeman's return policy, is
5  that memorialized anywhere, to your knowledge?
6  A.  I haven't seen it.
7  Q.  Is it on Hickey Freeman's website?
8  A.  I can't tell you.
9  Q.  Does Hickey Freeman's return policy
10  provide that a return must be made within a
11  certain amount of days of receiving the goods?
12  A.  I'm not aware of that.
13  Q.  We talked about earlier who you
14  believed Hickey Freeman's competitors were in
15  the suit business, men's suit business.
16     Have any new companies come on to the
17  market that are now competing with Hickey
18  Freeman since, you know, 2013 to today?
19     MR. D'ANGELO: Objection to form.
20     You can answer.
21  A.  Simple answer is no.  As it relates
22  to full canvas, high-quality suits, I'd say no.
23  Q.  What about half canvas?
24  A.  I'd say yes.
25  Q.  And who are those new players, so to

Page 254

1  ABRAMOWICZ - CONFIDENTIAL
2  speak?
3  A.  Since what period?
4  Q.  Since January 2013.
5  A.  I wouldn't be able to identify all
6  the new half canvas competitors that are on the
7  market because there's people that come in
8  imports, and those would be competitors.  They
9  could either be from Italy or China or
10  wherever, Eastern European countries.  But
11  there's a large market in the lower-end half
12  canvas business.
13  Q.  Can you describe for this year, 2018,
14  how many half canvas competitors have joined
15  the market?
16     MR. D'ANGELO: Objection to form.
17     You can answer.
18  A.  I'm not aware of any new ones.
19  Q.  What about in 2017?
20  A.  I'm not aware of any names of new
21  ones, no.
22  Q.  Do you keep in contact with Dillard's
23  currently?
24  A.  Personally.
25  Q.  Yes.

Page 255

1  ABRAMOWICZ - CONFIDENTIAL
2  A.  I'm not in direct contact with
3  Dillard's personally right now, no.
4  Q.  When you contacted Dillard's
5  regarding the damage suits that are the subject
6  of this complaint, did your communications
7  cease after that phase?
8  A.  After the phase, yes.  Because this
9  was a manufacturing issue, so I was getting
10  directly involved and speaking to Charlie about
11  it.
12  Q.  Have you ever heard of a company
13  called Fitexin (phonetic)?
14  A.  No.
15  Q.  Have you ever heard of a company
16  called Chargeurs Entoilage?
17  A.  Again, outside of the litigation?
18  Q.  Yes.
19  A.  No.
20  Q.  Did Hickey Freeman know that
21  Wujiang -- Lainiere de Picardie Wujiang
22  Textiles was the manufacturer of the
23  interlining before this litigation?
24  A.  No.
25  Q.  Did Hickey Freeman ever explain to

Page 256

1  ABRAMOWICZ - CONFIDENTIAL
2  any customers that jostling or movement of the
3  suits could bring the strike-back about?
4  Could -- let me strike that question.
5     Did Hickey Freeman explain to any of
6  its customers that movement could bring about
7  puckering or bubbling on its suits?
8     MR. D'ANGELO: Objection to form.
9     You can answer.
10  A.  I can't personally speak for what was
11  said by either the sales staff or like sales
12  staff to Nordstrom or the sales staff to Saks,
13  whether that is what brought it about.  So
14  personally I didn't speak to anybody about it.
15  Q.  Are you aware of anybody telling any
16  customer that movement or jostling can cause
17  puckering or bubbling or some similar
18  appearance to emerge on your suits?
19  A.  Well, in our discussions with
20  Dillard's, yes, because when we had talked to
21  Charlie about the fact that he had a top of
22  production in his office and it looked perfect
23  and all the rest, then he was -- we were
24  discussing, well, how did we go from looking
25  perfect to looking the way it was.