UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                             :
HICKEY FREEMAN TAILORED CLOTHING,                            :
INC.,                                                        :
                                                             :
                        Plaintiff,                           :
                                                             :
            v.                                               :            17 Civ. 5754 (KPF)
                                                             :
CHARGEURS, S.A., LAINIÈRE DE PICARDIE                        :            OPINION AND ORDER
INC., LAINIÈRE DE PICARDIE (WUJIAN)                          :
TEXTILES CO. LTD., and VERATEX LINING                        :
LTD.,                                                        :
                                                             :
                        Defendants.                          :
                                                             :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: November 1, 2018

KATHERINE POLK FAILLA, District Judge:

For the past 18 months, the parties to this action have engaged in vigorous, often contentious, fact discovery into Plaintiff's claims concerning the manufacture and sale of suit lining material known as "interlining." Purportedly as a result of what it has learned in discovery, Plaintiff now seeks leave to amend its complaint, nearly eight months after the deadline has passed, to add as defendants Fitexin and Chargeurs Entoilage (the "Proposed Defendants"). Both are intermediary corporate entities in the supply chain for the allegedly defective materials. In the same vein, Plaintiff moves to compel current Defendant Chargeurs S.A. ("Chargeurs") to produce documents in the possession of the Proposed Defendants, both of which are wholly owned subsidiaries.

Though neither side's legal arguments are unassailable, the Court finds Plaintiff's explanation of its delay — that prior to depositions conducted between May and June 2018, Plaintiff was ignorant of the extent of the Proposed Defendants' involvement in the manufacture and sale of the interlining — to be plausible. Conversely, Defendants have not plainly shown either that Plaintiff has acted in bad faith or that Defendants would be unduly prejudiced by a grant of leave to amend. The Court finds as well that Chargeurs exercises control over the Proposed Defendants, and, by extension, over documents in their possession. Accordingly, and for the reasons stated in the remainder of this Opinion, Plaintiff's motions for leave to amend the Complaint and to compel discovery are granted.

## BACKGROUND[1]

### A.    Factual Background

In brief, Plaintiff alleges that Defendants manufactured defective "fusible interlining," a garment material used to line the inside of suits, and then sold the defective material to Plaintiff in breach of contract, express and implied

---

[1]    The facts set forth herein are drawn from Plaintiff's Complaint ("Compl." (Dkt. #1, Ex. A)), the well-pleaded facts of which are taken as true for purposes of this motion. *See Morrison* v. *Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 679 (2009). For convenience, Plaintiff's moving brief is referred to as "Pl. Br." (Dkt. #77); Defendants' brief in opposition as "Def. Opp." (Dkt. #84); Plaintiff's reply as "Pl. Reply" (Dkt. #88); the May 31, 2018 deposition of Gilles Hourlier as "Hourlier Tr." (Dkt. #78-20); the June 12-13, 2018 deposition of Francois Rousseau as "Rousseau Tr." (Dkt. #68-7, 84-14); the June 18-19, 2018 deposition of Vanessa Defait as "Defait Tr." (Dkt. #68-5, 68-6); the June 25, 2018 deposition of Alan Abramowicz as "Abramowicz Tr." (Dkt. #78-24); and the transcript of the Court's oral opinion and order dated April 19, 2018, as "Apr. Order" (Dkt. #53). Because of inconsistencies in the spelling of the name Lainière in prior filings with the Court, the Court will consistently use the spelling Lainière, even if it differs from the spelling in the quoted document.

warranties, and duties of care.  (Compl. ¶ 1).  Plaintiff allegedly purchased the defective materials through a distributor, Veratex, from Chargeur Fashion Technologies ("CFT"), "a division of Defendant Chargeurs, [which] bills itself as one of the world's leading manufacturers and distributors of fusible interlining, operating through Chargeurs' direct and indirect subsidiaries, Defendants Lainière France, Lainière US and Lainière Textiles[.]" (*Id.* at ¶ 3).  Chargeurs and Lainière France are French corporations, Lainière U.S. is a U.S. corporation, Veratex is a Canadian corporation, and Lainière Textiles, also known as "Wujiang," is a Chinese corporation with a principal place of business in Suzhou, China.  (*Id.* at ¶¶ 9-13).  The Complaint alleges that "Lainière Textiles is a direct or indirect subsidiary of Defendant Chargeurs within its CFT division, and manufactures CFT-branded products that are sold in New York and throughout the United States." (*Id.* at ¶ 12).

## B.    Procedural Background

Plaintiff commenced this action on June 23, 2017, in the Supreme Court of the State of New York, New York County.  (Compl. 1).  Defendants removed the action to this Court on July 28, 2017.  (Dkt. #1).  Initially, the Court set the deadline to amend a pleading or add a party as December 29, 2017.  (Dkt. #14, ¶ 4).  Defendants filed a motion to dismiss, which the Court denied, and the parties subsequently embarked on a protracted period of fact discovery.  (*See* Dkt. #17-21, 52, 74).

One discovery dispute in particular concerned Plaintiff's ability to obtain documents from, and to effect service on, Defendant Lainière Textiles in China.

(*See, e.g.*, Dkt. #39 at 6-9; Apr. Order 4).  In this regard, on February 16, 2018, Plaintiff filed a motion to compel Chargeurs to produce all responsive documents in the possession of Lainière Textiles, noting "the difficulty if not impossibility of effectuating service in China" on Lainière Textiles.  (Apr. Order 17; *see also* Dkt. #38 at 15-17).  Plaintiff argued that Chargeurs had "disclaimed responsibility" over the defective interlining "by suggesting that a purportedly 'separate entity' based in the People's Republic of China ('PRC'), Lainière Textiles, was solely responsible for the defect…. [and] repudiating *any* discovery obligation with respect to documents and information within Lainière Textiles' possession[.]"  (Dkt. #38 at 1).

On April 19, 2018, the Court ordered Chargeurs to produce the relevant documents, finding that "Chargeurs S.A. owns and exerts control over Lainière Textiles."  (Dkt. #47; Apr. Order 6).  In reaching this conclusion, the Court relied in part on the undisputed fact that Lainière Textiles is a wholly-owned subsidiary of Fitexin, "the entity that controls Chargeurs S.A.'s fashion technologies segment, which itself is a wholly-owned subsidiary."  (Apr. Order 6-7).  The Court further ordered Chargeurs "to produce a corporate representative for a deposition who can speak to Lainière Textiles' business insofar as it relates to the control exercised by Chargeurs S.A."  (*Id.* at 12).  On July 17, 2018, the Court once again ordered Chargeurs "to produce all Lainière Textiles documents in its possession, custody, or control no later than August 3, 2018."  (Dkt. #74 at 1).

On July 3, 2018, Plaintiff filed a letter with the Court contending that Chargeurs had "flouted the April 19 Order by refusing to collect and produce documents from the very entities (Fitexin and Chargeurs Entoilage) through which ... it controls Lainière Textiles," and further asserting that "the culpability of Chargeurs Entoilage and Fitexin with respect to the matters at issue in this action was made clear only through recent depositions[.]" (Dkt. #70 at 3). On August 17, 2018, Plaintiff filed the instant motion to amend its Complaint to add the Proposed Defendants. (Dkt. #76). Defendants submitted a memorandum in opposition on September 14, 2018 (Dkt. #84), and Plaintiff replied on September 28, 2018 (Dkt. #88).

## DISCUSSION

### A.  Plaintiff's Motion to Amend Is Granted

#### 1.  Applicable Law

"[T]he court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. The Court's discretion to do so here is also subject to the standards of Federal Rules of Civil Procedure 15(a) and 16(b). "Rule 15(a)(2) allows a party to amend its pleading with the court's leave, which should be 'freely give[n] ... when justice so requires.'" *F5 Capital* v. *Pappas*, 856 F.3d 61, 88-89 (2d Cir. 2017) (quoting Fed. R. Civ. P. 15(a)(2)). The Rule's standard is "permissive," and reflects a "strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Williams* v. *Citigroup Inc.,* 659 F.3d 208, 212-13 (2d Cir. 2011) (per curiam)).

Yet, while permissive, the standard has limits. "Leave to amend, though liberally granted, may properly be denied for" a number of reasons, including: "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment[.]" *Temple* v. *Hudson View Owners Corp.*, 222 F. Supp. 3d 318, 325 (S.D.N.Y. 2016) (internal quotation marks omitted) (quoting *Ruotolo* v. *City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008)); *accord Loreley*, 797 F.3d at 190. "The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith." *AEP Energy Servs. Gas Holding Co.* v. *Bank of Am., N.A.,* 626 F.3d 699, 725 (2d Cir. 2010) (internal citation and quotation marks omitted).

Federal Rule of Civil Procedure 16(b), in turn, states that the district court's schedule, including its deadlines for the joinder of parties and amendments to the pleadings, "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b). The Second Circuit has balanced the permissive amendment standard embodied in Rule 15(a) with the good cause requirement of Rule 16(b) by holding that, after the deadline to amend has passed, "a finding of 'good cause' depends on the diligence of the moving party." *Parker* v. *Columbia Pictures Industries*, 204 F.3d 326, 340 (2d Cir. 2000).

"Good cause is demonstrated by a showing that despite its having exercised diligence, the applicable deadline could not have been reasonably met

by the plaintiff." *Soroof Trading Development Co., Ltd.*, v. *GE Microgen, Inc.* 283 F.R.D. 142, 147 (S.D.N.Y. 2012) (internal citation and quotation marks omitted). "Thus, if the proposed amendment relies on information that the party knew or should have known prior to the deadline, leave to amend is properly denied." *Id.*; *see also Parker*, 204 F.2d at 341 (affirming the district court's denial of leave to amend where the plaintiff "had all the information necessary" to support the claim at the time the action was commenced, and where "nothing he learned in discovery or otherwise altered that fact"). "The court also has discretion to deny leave to amend where the motion is made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties[.]" *Grace* v. *Rosenstock*, 228 F.3d 40, 53-54 (2d Cir. 2000) (internal citation and quotation marks omitted).

## 2.  Analysis

Plaintiff makes three primary arguments in favor of leave to amend to add Fitexin and Chargeurs Entoilage as Defendants, all of which are contested by Defendants. *First*, Plaintiff contends that it has acted diligently and without undue delay. (Pl. Br. 5-13). *Second,* Plaintiff argues that its motion to amend is brought in good faith. (*Id.* at 13-14). *Third*, Plaintiff maintains that the proposed amendment will not prejudice the existing Defendants. (*Id.* at 14-19). The Court addresses each argument in turn, and ultimately finds that Plaintiff has satisfied both the Rule 15(a) and Rule 16(b) standards.

### a. Plaintiff Has Not Unduly Delayed in Seeking Leave to Amend

The Court begins by considering Plaintiff's "'undue delay' … in deciding whether to grant [it] leave to amend under Rule 15(a)." *Krupski* v. *Costa Crociere S.p.A.*, 560 U.S. 538, 553 (2010) (quoting *Foman* v. *Davis*, 371 U.S. 178, 182 (1962)). "When a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." *Park B. Smith, Inc.* v. *CHF Indus. Inc.*, 811 F. Supp. 2d 766, 779 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). Significantly, in the Second Circuit, "[s]imply alleging that the plaintiff could have moved to amend earlier," without more, is insufficient to show undue delay. *Agerbrink* v. *Model Service LLC*, 155 F. Supp. 3d 448, 452 (S.D.N.Y. 2016). "[H]owever, the moving party must provide an explanation for the delay." *Id.*

Plaintiff moved for leave to amend on August 17, 2018, over a year after filing the Complaint and nearly eight months after the deadline to amend had passed. (Dkt. #1, 14, 76). Plaintiff submits that this delay is justified, however, because it "did not discover — and could not have reasonably discovered — the *extent* of Fitexin and Chargeurs Entoilage's involvement in the events at issue here until depositions conducted in this action in late June 2018." (Pl. Br. 5 (emphasis added)). Specifically, Plaintiff sources its newfound knowledge to three depositions that occurred well after the deadline for amended pleading: the May 31, 2018 deposition of Gilles Hourlier, a Lainière France corporate representative; the June 12-13, 2018 deposition of Francois

Rousseau, a Chargeurs executive and Fitexin employee; and the June 18-19, 2018 deposition of Vanessa Defait, a Chargeurs corporate representative. (*Id.* at 1, 9, 23). Plaintiff asserts that, as soon as it learned the relevant facts, it acted promptly to move to amend. (*Id.* at 12).

The record certainly supports the proposition that Plaintiff learned critical information about the role of both Fitexin and Chargeurs Entoilage from these depositions. For instance, on June 12, 2018, Rousseau testified that Chargeurs Entoilage is the "hierarchical superior of all the other entities in the [CFT] division" (Rousseau Tr. 40:5-15), and Defait testified that Chargeurs Entoilage is "the head of the CFT division" (Defait Tr. 98:21-23). The Defait deposition further revealed that CFT's managing director served simultaneously as president of both Chargeurs Entoilage and Fitexin. (*Id.* at 98:6-20). And Rousseau's and Hourlier's testimony combined showed that a Fitexin employee was directly involved with the production of CFT products. (Rousseau Tr. 117:23-119:9; Hourlier Tr. 90:24-91:6).

However, that the May and June 2018 depositions were critical sources of information does not establish that they were the initial sources to which Plaintiff did, or could reasonably be expected to, have access. As a result, Plaintiff undertakes to prove a negative, i.e., that it had no earlier reasonable means to access information about the extent of Chargeurs Entoilage's and Fitexin's purported involvement in the manufacture and sale of defective interlining.

To start, Plaintiff argues that it did not in fact know about Chargeurs Entoilage and Fitexin prior to May or June of 2018, as shown by Alan Abramowicz's testimony that he had never heard of either entity prior to this litigation. (Abramowicz Tr. 255:12-19; Pl. Br. 5). The Court finds Plaintiff's reliance on this testimony misplaced, inasmuch as Abramowicz also testified that he had never heard of Chargeurs outside the context of this litigation. (*Id.* at 45:17-25). Defendants point out as well that the Court previously expressed concern as to whether Abramowicz was adequately prepared for his deposition. (*See* Dkt. #82 at 44, 94, 105; Def. Opp. 12). Accordingly, the Court affords little weight to Abramowicz's deposition testimony.

In any event, the Court agrees with Defendants that the relevant inquiry is not what Plaintiff did know, but what it "knew or should have known." (Def. Opp. 12). As to the latter, Plaintiff asserts that neither Chargeurs' regulatory filings, nor its publicly available marketing materials and websites, offered "information explaining the role of Fitexin and Chargeurs Entoilage in its interlining business." (Pl. Br. 6). Defendants do not dispute the absence of such information in these public materials, arguing instead that this absence "corroborates that neither entity manufactures or sells interlining," nor "had anything to do with the sale of allegedly defective interlining[.]" (Def. Opp. 14-15). As it happens, Defendants' position merely digs them into a deeper hole: Plaintiff's citations to the May and June 2018 depositions suffice to support a reasonable belief that Fitexin and Chargeurs Entoilage had involvement in the interlining production or distribution, and Defendants' protests to the contrary

simply support Plaintiff's claims of difficulty uncovering the information necessary to name these entities as defendants.

Plaintiff also argues that Defendants' own inadequate compliance with discovery demands prevented Plaintiff from "learning the extent (or even the fact) of Fitexin's and Chargeurs Entoilage's operational involvement in Chargeurs' CFT business[.]" (Pl. Br. 11). In support, Plaintiff points out that neither Chargeurs' Rule 26(a)(1) initial disclosures nor its response to Plaintiff's September 29, 2017 interrogatories "identif[ied] any employees of Fitexin or Chargeurs Entoilage as individuals likely to have discoverable information." (*Id.* at 8). Plaintiff maintains that it first learned the names of certain individuals involved in investigating the defective lining — specifically Rousseau and Bernard Vossart — in April or May of 2018, when their identities were revealed through privilege logs concerning their correspondence. (*Id.* at n.2).

Defendants assert that Plaintiff's president repeatedly emailed Vossart, met in person with Rousseau, and attended and recorded a presentation by Rousseau, which Plaintiff then quoted in its Complaint. (Def. Opp. 13). Plaintiff's counsel also sent pre-litigation demand letters to both Rousseau and Vossart. (*Id.*). Defendants contend that if Rousseau and Vossart "were important enough to the case" for Plaintiff's president and counsel to undertake these efforts, "and assuming [Plaintiff] believed that Defendants' discovery did not properly identify them, it could have sought an extension of the deadline to add parties." (*Id.* at 13-14). The Court does not find this

argument compelling, since Plaintiff has not asserted ignorance as to Rousseau's and Vossart's general relationship to the case, but only as to their roles in investigating the defective lining.

Defendants point out as well that Rousseau has testified that he was not involved in, and had no first-hand knowledge of, an investigation of the interlining. (Def. Opp. 13 (citing Rousseau Tr. 293:8-12)). This response is part of Defendants' broader position that "Chargeurs Entoilage and Fitexin do not control CFT or any of its subsidiaries[.]" (*Id.* at 7). As explained above, this position hurts Defendants more than it helps them. Given the record support for Plaintiff's allegation that Fitexin and Chargeurs Entoilage were culpable in manufacturing or distributing the defective interlining, Defendants' protestations merely underscore that Plaintiff's due diligence could not have revealed the relevant information earlier.

Defendants characterize Plaintiff's proffered new information thusly: "that Chargeurs Entoilage was a direct subsidiary of Chargeurs S.A., that Fitexin was a direct subsidiary of Chargeurs Entoilage, that Wujiang was a direct subsidiary of Fitexin, that Mr. Bernard Vossart was the president of both Fitexin and Chargeurs Entoilage including the managing director of CFT, and that all three entities are part of the division of CFT, a trademark that describes a division of subsidiaries." (Def. Opp. 7). Defendants then offer four main arguments for why June 2018 could not have been the first time Plaintiff learned this information. As explained in the remainder of this section, none is persuasive.

12

*First*, Defendants cite a June 25, 2018 letter to the Court, in which Plaintiff stated its belief that the Court's April 19, 2018 Order was "unequivocal that Chargeurs exercises 'control' of Lainière Textiles through ... Fitexin and Chargeurs Entoilage — and thus left no doubt that Chargeurs exercises control of these entities as well." (Dkt. #67 at 2; *see also* Dkt. #70 at 3). Defendants contend that this statement shows Plaintiff was on notice that Fitexin and Chargeurs Entoilage "were allegedly involved in CFT's *interlining* business[.]" (Def. Opp. 7 (emphasis added)). Plaintiff replies that the Court's Order "said nothing about Fitexin or Chargeurs Entoilage being involved in *interlining* product development, manufacturing, quality control, marketing, strategy, or decision making." (Pl. Reply 5 (emphasis added)).

Both parties' arguments miss the key point. Plaintiff is correct that the Court's April 19 Order did not specify Fitexin's or Chargeurs Entoilage's involvement in interlining production or distribution, and indeed did not mention Chargeurs Entoilage at all. (*See* Apr. Order).[2] Accordingly, the Court's April Order was not sufficient to put Plaintiff on notice that either Fitexin or Chargeurs Entoilage should be joined as defendants in this action. And, while Defendants are correct that Plaintiff's own letter characterizing the April Order shows its awareness that Chargeurs might control Lainière Textiles through both Fitexin and Chargeurs Entoilage, that letter was written on

---

[2]     The only mention of Fitexin in the Court's April 19, 2018 Order is the statement: "Chargeurs S.A. owns and exerts control over Lainière Textiles. That entity is a wholly-owned subsidiary, and it is a subsidiary of Fitexin, the entity that controls Chargeurs S.A.'s fashion technologies segment, which itself is a wholly-owned subsidiary." (Apr. Order 6-7).

June 25, 2018.  Plaintiff's knowledge as of that date accords with its explanation that Plaintiff first obtained the relevant information through depositions in May and June of that year.

Defendants' second argument is that an April 26, 2018 motion describing Rousseau's affiliation with Fitexin put Plaintiff on notice that Rousseau — an individual quoted in the Complaint and thus presumably significant to this action — was a Fitexin employee.  (Def. Opp. 8; *see also* Dkt. #48-1 at 2, 7).  From this notice, Defendants contend that Plaintiff should have inferred that Fitexin shared a common legal interest with Defendants.  (Def. Opp. 8).  The Court disagrees.  While the motion for a protective order disclosed Rousseau's status as a Fitexin employee, it did not disclose Fitexin's role in the interlining business sufficiently to require Plaintiff to move to amend and join Fitexin at that point in time.  (Dkt. #48-1; *see also* Pl. Reply 5).  Perhaps more to the point, the April 26, 2018 motion was well after the December 29, 2017 deadline to amend.  (*See* Pl. Reply 5).  Defendants rely on the purported notice from that motion to fault Plaintiff for "failure to specify the timing of its alleged discovery."  (Def. Opp. 8).  But given that the motion did not clearly establish notice, it also has not clearly debunked Plaintiff's own narrative about the timing of its discovery.

*Third*, Defendants quote from Plaintiff's August 8, 2017 letter to the Court, which letter states that Chargeurs "owns and controls the Chargeurs Fashion Technologies brand, under which Chargeurs and its direct and indirect subsidiaries [] manufacture, market and distribute fusible

interlining[.]" (Dkt. #11 at 1).  Chargeurs' only direct subsidiary within CFT is Chargeurs Entoilage; Fitexin is an indirect subsidiary.  (Def. Opp. 9).  The subsidiary status of both Chargeurs Entoilage and Fitexin was disclosed in public documents before this action commenced.  (*Id.*).  From this, Defendants conclude that Plaintiff must have known as of August 2017 that Chargeurs Entoilage and Fitexin manufacture or market fusible interlining.  (*Id.*).

Plaintiff replies that its August 8, 2017 letter did "not indicate that it was aware of Fitexin's and Chargeurs Entoilage's involvement in this case at that earlier juncture.  The letter is silent as to Fitexin and Chargeurs Entoilage, and mentions only the Lainière defendants."  (Pl. Reply 5 n.5).  Plaintiff is correct.  Defendants have quoted selectively from the letter, which states more fully: "Chargeurs owns and controls the Chargeurs Fashion Technologies brand, under which Chargeurs and its direct and indirect subsidiaries, including Defendants Lainière France, Lainière US and Lainière Textiles, manufacture, market and distribute fusible interlining[.]"  (Dkt. #11 at 1).  Taken in full, the letter reflects Plaintiff's belief that the defendants named in the case as of August, 2017, were the relevant parties, and does not indicate that Plaintiff knew of any other direct or indirect subsidiaries involved in the interlining business.

*Fourth*, Defendants argue that Plaintiff failed to exercise due diligence given that, prior to filing the lawsuit, Plaintiff was on constructive notice of public documents that, according to Defendants, contained the relevant information.  (Def. Opp. 9).  For instance, documents on file with the Clerk of

Commercial Courts in France, with D&B Credit Reports, and with Hoovers Reports stated that Vossart was a president of both Chargeurs Entoilage and Fitexin. (*Id.* at 10). Further, Plaintiff knew that it needed to perform such due diligence at least by August 2017, because it informed the Court at that time that it was uncertain as to who the proper defendants were in the case. (*Id.* at 10-11). Plaintiff replies that, while the reports and other public documents may have disclosed that Fitexin and Chargeurs Entoilage "reside within the Chargeurs corporate family," they do not disclose these entities' "involvement in interlining" business functions. (Pl. Reply 6). The Court agrees with Plaintiff that the "mere fact that Fitexin and Chargeurs Entoilage reside within the Chargeurs corporate structure," without more, did not establish a basis to name them as defendants. (*Id.*).

In sum, it is Plaintiff's burden to "provide an explanation for the delay." *Agerbrink*, 155 F. Supp. at 452. While the Court finds neither side's arguments as to undue delay to be overwhelming, Plaintiff has put forth *an* explanation, namely that it did not know, and could not reasonably have been expected to know, the extent of Fitexin's and Chargeurs Entoilage's roles in the interlining business until the depositions in May and June of 2018. Defendants have failed to refute this explanation. Therefore, the Court finds Plaintiff's explanation credible.

> **b.  Defendants Have Not Met Their Burden to Show Bad Faith**

Defendants proceed to argue that Plaintiff has acted in bad faith, claiming inconsistencies in Plaintiff's story as to *when* it discovered that Fitexin

and Chargeurs Entoilage were allegedly involved with the interlining. (Def. Opp. 17-18). Defendants assert that Plaintiff initially stated it made the discovery from Rousseau's June 12, 2018 deposition, then later that its discovery extended from that same deposition through the last two weeks of June, and then finally that the discovery stems from the May, 2018 deposition of Lainière de Picardie BC SAS. (*Id.* (citing Pl. Br. 9)). The Court agrees with Plaintiff's explanation that these purported inconsistencies are nothing of the sort:

> The testimony most central to this motion was provided by Mr. Rousseau and Ms. Defait in June 2018 — more than six months after the deadline for amended pleadings. Mr. Hourlier's testimony on May 31, 2018, that the product developer for Chargeurs-branded interlining works for Fitexin provided the basis for further questioning into that same subject with Mr. Rousseau and Mr. Defait days later.

(Pl. Reply 10 n.10).

Defendants further contend that the depositions on which Plaintiff relies "do not show that Fitexin and Chargeurs Entoilage have any operational involvement in CFT's interlining business," and that Plaintiff's assertion that they do "misconstrues the testimony." (Def. Opp. 18, 23). Moreover, Defendants urge the Court to deny the motion "because [Plaintiff] turns a blind eye to an abundance of testimony controverting its allegations[.]" (*Id.* at 23). Plaintiff replies that it is Defendants who misconstrue Rousseau's testimony, pointing out that Defendants have not disputed that "Fitexin develops interlining products for CFT, determines where each model of interlining is manufactured, markets CFT interlining, and develops strategy for that

division." (Pl. Reply 8). The Court finds that neither the suggestion of inconsistency, nor the fact that Plaintiff cannot yet proffer detailed allegations as to precisely how Fitexin and Chargeurs Entoilage are involved in the interlining business, satisfies Defendants' burden to show bad faith.

### c. Leave to Amend Would Not Unduly Prejudice Defendants

### i. Applicable Law

Perhaps the most significant inquiry is that of prejudice. "A litigant may be 'prejudiced' within the meaning of [Rule 15(a)(2)] if the new claim would: (i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; [or] (ii) significantly delay the resolution of the dispute[.]" *Pasternack* v. *Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (internal quotation marks and citation omitted). "[T]he fact that one party has spent time and money preparing for trial will usually not be deemed prejudice sufficient to warrant a deviation from the rule broadly allowing amendment to pleadings." *Monahan* v. *N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000). "Nor can complaints of the time, effort and money … expended in litigating [the] matter, without more, constitute prejudice sufficient to warrant denial of leave to amend." *Pasternack*, 863 F.3d at 174 (internal citation and quotation marks omitted).

"The non-moving party has the burden to show any prejudice of [a] proposed amendment." *Green* v. *Dist. Council 1707, Am. Fed'n of State, Cty., & Mun. Emps., AFL-CIO*, No. 13 Civ. 8671 (PAE), 2015 WL 4621107, at *1 (S.D.N.Y. Aug. 3, 2015). "Often, as here, the concepts of undue delay and

prejudice are interrelated." *Sly Magazine, LLC* v. *Weider Publications L.L.C.*, 241 F.R.D. 527, 532 (S.D.N.Y. 2007). Thus, evaluating Rule 15 prejudice "requires an assessment of not only the amount of time that passed before the movant sought to amend, but also the reasons for that delay and its practical impact on the other side's legitimate interests, including both that party's ability to respond to new claims or defenses and any other prejudice flowing from a delay in the final adjudication of the case." *RCX I, LLC* v. *Pitter-Nelson*, No. 11 Civ. 3513 (CM), 2014 WL 5809514, at *6 (S.D.N.Y. Nov. 6, 2014) (quoting *JPMorgan Chase Bank, N.A.* v. *IDW Grp., LLC*, No. 08 Civ. 9116 (PGG), 2009 WL 1357946, at *3 (S.D.N.Y. May 12, 2009)).

### ii. Leave to Amend Would Not Require Significant Additional Resources for Discovery and Trial Preparation

Defendants have not carried their burden to show that granting Plaintiff's motion for leave to amend would result in undue prejudice. For its part, Plaintiff argues that amendment would not cause undue prejudice because it would merely result in the addition of new parties, as opposed to new causes of action or legal theories. (Pl. Br. 14). Moreover, the joinder would not cause prejudicial surprise because, in Plaintiff's view, Chargeurs' knowledge of its own subsidiaries' roles in manufacturing and distributing the interlining should have led it to anticipate that Chargeurs Entoilage and Fitexin would be "critical parties to this dispute." (*Id.* at 17-18).

As ancillary positions, Plaintiff posits that "it is unlikely that the amendment would require any additional discovery from Chargeurs, given the

absence of any new causes of action or theories of liability in the Amended Complaint." (Pl. Br. 15). At the very least, the amendment "should not result in much additional discovery beyond the documents that Chargeurs itself should be required to produce[.]" (*Id.* at 15-16). Further, even if Chargeurs were required to put some additional resources toward discovery, Plaintiff asserts that that requirement alone does not establish prejudice. (*Id.*). In contrast, forcing Plaintiff to file a new action against Chargeurs Entoilage and Fitexin would require duplicate productions and disserve judicial economy. (*Id.* at 18).

Defendants respond that, if there is "little to no further discovery" needed, Plaintiff's ability to file a new action should weigh in favor of denying the motion to amend. (Def. Opp. 26). To this point, Plaintiff reiterates simply that "Chargeurs has refused to turn over any Fitexin and Chargeurs Entoilage documents." (Pl. Reply 12). The Court distills this purported dispute into apparent agreement by the parties that Chargeurs' discovery obligations would be similar with or without joinder, and hence finds that amendment would not require the existing Defendants to expend significant additional resources for discovery and trial.

Defendants next contend that the joinder of Chargeurs Entoilage and Fitexin may cause these new defendants to retain separate attorneys and expend resources on discovery, which Defendants argue will result in "significant costs to both and further delay to Defendants." (Def. Opp. 24). Plaintiff replies that "there is no indication that Fitexin or Chargeurs Entoilage

20

actually will 'retain different counsel,'" and in any event the need for more discovery does not, without more, establish prejudice. (Pl. Reply 11). The correct legal inquiry is of prejudice to the non-moving party, here the existing Defendants. That the joinder of new defendants will require *those* defendants to expend resources in discovery and trial preparation does not constitute prejudice to the non-moving party. Hence, the Court finds that Defendants have not shown that leave to amend will impose "significant [monetary] costs" on *them*. To be sure, were Chargeurs Entoilage and Fitexin to retain new counsel, that counsel would likely require time to engage in discovery and trial preparation, causing delays that would affect the existing Defendants. However, for reasons articulated more fully in the following section, including that expert discovery remains outstanding, the Court finds that the possibility of some delay to afford new counsel time to prepare is not significant enough to constitute undue prejudice.

### iii. Leave to Amend Would Not Significantly Delay the Resolution of the Dispute

Defendants also argue that granting Plaintiff's motion would "significantly delay the resolution of" this case. *Pasternack*, 863 F.3d at 174 (internal citation and quotation marks omitted). As Defendants point out, Plaintiff's very motion to amend was not fully briefed until after the close of fact discovery. (Def. Opp. 24). Plaintiff replies that "[c]ourts routinely permit the addition of parties after the close of fact discovery." (Pl. Reply 10). It suggests that any additional discovery could be undertaken concurrent with expert discovery in the case, which is currently stayed, or concurrent with discovery

as to Lainière Textiles, which has yet to be served, and that such discovery would not delay summary judgment or trial because the Court has yet to set a schedule for summary judgment or trial. (Pl. Br. 16 & n.7). In making these arguments, Plaintiff relies on *State Teachers Retirement Bd.* v. *Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981), in which the Second Circuit found abuse of discretion in a district court's denial of leave to amend:

> Although State Teachers' amendment may result in a delay, it will not unduly prejudice the defendant.... This is not a case where the amendment came on the eve of trial and would result in new problems of proof.... At the time plaintiffs requested leave to amend, no trial date had been set by the court and no motion for summary judgment had yet been filed by the defendants. Also, it appears that the amendment will not involve a great deal of additional discovery.

*Id.* at 856.

Defendants retort that permitting Plaintiff to slip in discovery of Chargeurs Entoilage and Fitexin under cover of the delay that has already been caused by the anticipated service of Lainière Textiles "would improperly allow [Plaintiff] to gain a litigation advantage and reward for waiting until May 14, 2018, long after it filed the complaint, to even attempt service on the manufacturer[.]" (Def. Opp. 24). Defendants observe that they have already been prejudiced by the delayed joinder of Lainière de Picardie BC SAS as a defendant, which defendant Plaintiff eventually withdrew upon acknowledging that it was unrelated to the action. (*Id.*; *see also* Dkt. #81). Plaintiff contests the conclusion of past prejudice as well as its broader relevance to the present inquiry. (Pl. Reply 11 & n.11).

The Court agrees with Plaintiff that any past prejudice to Defendants from prior delayed service of, or prior joinder and withdrawal of parties, is only tangentially related to an inquiry into future prejudice. More significant to the Court's decision is the fact that neither party has established a clear case for, or against, prejudice in the form of delayed resolution. Weighing the various factors, including the months of extended discovery that have already taken place, the expert discovery yet to take place, and the absence of prejudicial surprise of the type described in *Fluor Corp.*, 654 F.2d at 856, does not convince the Court that joinder at this stage of the litigation will necessarily result in extensive additional delays. Defendants bear the burden of establishing undue prejudice. They have not done so here.

To be clear, the parties' submissions fail to establish a clear-cut case for grant or denial. However, evaluating with care the arguments of both sides and the record support proffered as substantiation for these arguments, the Court believes that the values and principles underlying Federal Rules of Civil Procedure 15, 16, and 21 are best served by permitting the amendment. Accordingly, the motion leave to amend is granted.

## B.    Plaintiff's Motion to Compel Is Granted

### 1.    Applicable Law

Independent of joinder, Plaintiff also seeks to compel Defendant Chargeurs to produce responsive documents in the possession of its wholly-owned subsidiaries, Fitexin and Chargeurs Entoilage. (Pl. Br. 19). Federal Rule of Civil Procedure 34(a) obliges parties to produce documents within their

"possession, custody, or control."  Fed. R. Civ. P. 34(a).  As the Court explained

in its April 19, 2018 Order, the four factors to consider in assessing control are

the following: "[i] [t]he degree of ownership and control exercised by the parent

over the subsidiary; [ii] a showing that the two entities operate as one;

[iii] demonstrated access to documents in the ordinary course of business; and

[iv] an agency relationship."  (Apr. Order 6 (citing *Sicav* v. *Wang*, No. 12 Civ.

6682 (PAE), 2014 WL 2624753, at *4 (S.D.N.Y. June 12, 2014) (collecting

cases))).  "[T]he application of this concept is often highly fact-specific."  8B

Charles A. Wright et al., 8B FED. PRAC. & PROC. CIV. § 2210 (3d ed.).  Actual

physical possession over the documents is unnecessary; the right, authority, or

practical ability to obtain the documents will suffice.  *See In re NTL, Inc. Sec.*

*Lit.*, 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (collecting cases).  It is the movant's

burden to establish control.  *See Sicav*, 2014 WL 2624753, at *4.

    **2.**    **Analysis**

        **a.**    **The April 19, 2018 Order**

Plaintiff relies in the first instance on the Court's April 19, 2018 Order

compelling Chargeurs to produce responsive documents in the possession of

Lainière Textiles, and in particular its finding that Chargeurs exercised control

over Lainière Textiles.  (Pl. Br. 20; Apr. Order 4-11).  The Court found that "the

entire constellation of subsidiaries operate in furtherance of Chargeurs' overall

business strategy.  And in this regard, Chargeurs exerts control over its

subsidiaries."  (Apr. Order 7).  Plaintiff argues that the same rationale should

apply to Fitexin and Chargeurs Entoilage because it is through those entities that Chargeurs exercises control over Lainière Textiles. (Pl. Br. 21).

Defendants respond that the Court issued its April 19, 2018 Order without the benefit of deposition transcripts (Def. Opp. 30), and point to Defait's testimony that "Chargeurs, S.A. doesn't manage the strategy of its subsidiaries.... Chargeurs defines a strategy, a broad strategy ... but the actual strategies are defined by the divisions ... Chargeurs does not intervene in the daily workings, the daily management of subsidiaries" (Defait Tr. 131:14-132:21). Further, Defendants highlight portions of Defait's testimony asserting that the direction that Chargeurs provides sounds more in the realm of inspirational vision than actual control. (*See id.* at 217:22-25, 221:2-23; Def. Opp. 30).

While the Court recognizes that the cited portion of Defait's deposition could be read to suggest that Chargeurs exercises a light touch in relation to its subsidiaries, this snippet of testimony is insufficient to overcome the Court's prior conclusion that Chargeurs exercises control over Lainière Textiles through Fitexin and Chargeurs Entoilage. The findings in the Court's April 19, 2018 Order all but obligate the Court to grant Plaintiff's motion to compel. Nevertheless, to aid both certainty and comprehensiveness, the Court undertakes an independent analysis of the four *Sicav* factors for assessing Chargeurs' control over Fitexin and Chargeurs Entoilage, which analysis confirms the correctness of its original findings.

### b. Factor One: Chargeurs' Degree of Ownership and Control over Fitexin and Chargeurs Entoilage

The parties dispute whether Plaintiff has met its burden to show that Chargeurs controls documents in the possession of Chargeurs Entoilage and Fitexin.  (Pl. Br. 22-25; Def. Opp. 27).  It is uncontested — and the record supports — that Chargeurs owns one hundred percent of Chargeurs Entoilage, and that Chargeurs Entoilage owns one hundred percent of Fitexin.  (Defait Tr. 85:21-86:6, 179:17-24; Pl. Br. 22; Def. Opp. 27).  While Defendants are correct that "mere ownership by a parent" is but one of a number of factors, the Court finds that this factor weighs heavily in Plaintiff's favor.  (Def. Opp. 27).

As additional support for a finding of control, Plaintiff relies on Defait's testimony to assert that Chargeurs' representatives can remove the president of both entities; must approve major internal decisions within the entities; and retain approval authority over the entities' financial reporting.  (Pl. Br. 22).  Defendants challenge the record support for these assertions, calling them "mischaracterizations" of Defait's testimony.  For instance, Defendants contend that Defait did not in fact testify "that the board has the power to fire Fitexin's President."  (Def. Opp. 27 (citing Defait Tr. 179:2-13)).  The Court finds that if anyone has mischaracterized testimony, it was not Plaintiff:  Defait testified that Chargeurs and Chargeurs Boissy together comprise the supervisory boards of both Chargeurs Entoilage and Fitexin,[3] and that this board has the

---

[3]     Defait testified that "[t]he supervisory board for Fitexin has one representative from Chargeurs, S.A. and one representative from Boissy."  (Defait Tr. 105:15-19).

power to fire the president of Chargeurs Entoilage. (Defait Tr. 73:21-74:16, 179:2-9). Defait also testified that "[t]he supervisory board of Fitexin has pretty much the same role as the supervisory board of Chargeurs Entoilage." (*Id.* at 176:18-20). Hence, the record supports an inference that the board has the power to fire Fitexin's president.

Defendants next take three swipes at the significance of the supervisory board as a basis for inferring control. *First*, according to Defait's testimony, the board does not hold regular meetings and met only once between the end of 2017 and June 18, 2018. (Def. Opp. 27-28; Defait Tr. 107:16-21). *Second*, while the board retains approval authority over the subsidiaries' financial records, it has no power to *alter* those records, which power resides with the auditors. (Def. Opp. 27; Defait Tr. 208:16-209:18). *Third*, the board merely receives *consolidated* financial accounts, which, Defendants observe, the *Sicav* court found did not evince control over a subsidiary in the factual circumstances of that case. (Def. Opp. 28). *See Sicav*, 2014 WL 2624753, at *5.

The Court is unpersuaded by these attacks. The infrequency of board meetings as of June 18, 2018, suggests little, since the board had been in existence for roughly a mere six months at that time. (Pl. Reply 13 n.13; Defait Tr. 107:18-21). Meanwhile, Defait's testimony that Chargeurs must approve Chargeurs Entoilage's annual financial statements does suggest an element of control, since the approval serves as a gatekeeper check before the reports are sent to shareholders. Presumably, if the board had concerns about the reports, it could send them back to the auditor, who could in turn "issue a

reservation" on a finding of irregularity. (Defait Tr. 208:2-209:6). And the factual circumstances in which the *Sicav* court considered the submission of consolidated financial statements are far from those at issue here; the parent entity in that case was unable to "participate in its subsidiaries' decision-making ... [and could not] prevent its subsidiaries from, for example, buying or selling a factory." *Sicav*, 2014 WL 2624753, at *5. Here, in contrast, Defait testified that the president of each of Chargeurs' subsidiaries must either obtain approval from, or at least consult, the supervisory board before making internal decisions "[i]n relation to acquisitions to investments that fall above a certain threshold to changing internal auditors of the company, changes to the bylaws, in relation to the appointment of the president of the company and in relation to the company's ... scope of activities." (Defait Tr. 106:2-24; 176:21-178:16). This testimony supports a finding that Chargeurs has, and has a track record of actually exerting, control over its subsidiaries. *Cf. Sicav*, 2014 WL 2624753, at *6 (finding that a parent entity's lack of a track record of actually exerting control indicated a lack of authority or practical ability to obtain documents from subsidiaries).

### c.  Factor Two: Operating as One

Plaintiff contends that the record shows Chargeurs' close involvement with the operations of Fitexin and Chargeurs Entoilage. (Pl. Br. 23). Specifically, Defait testified that Chargeurs' "board of directors needs to be informed about the activities of the various subsidiaries just as the president of the group needs to be informed of that[.]" (Defait Tr. 68:16-19). For instance,

Fitexin's employee, Vossart, presented to the board about "outstanding data for the year, the acquisition plans in the pipeline, actions that were identified as part of the game changer plan and the budget forecast for 2018." (*Id.* at 66:14-15, 67:18-22). Defait testified that Chargeurs maintains a liability insurance policy for its subsidiaries, and would pay the deductible for any suit in a case where "the claim relates in any way to products that are produced by the CFT division[.]" (*Id.* at 266:13-270:18). And Defait testified that Chargeurs provides consulting and other services "of a human resource nature" to its subsidiaries. (*Id.* at 134:20-23, 210:10-211:3).

Rather than responding to these affirmative indicators of closely intertwined operations, Defendants focus on the absence of other potential indicators. For instance, Defendants argue that nothing in the record shows that the entities "share any employees, facilities, office space or utilize common practices and forms[.]" (Def. Opp. 28). Defendants then contend, correctly, that, even if the entities do all work together, that alone does not establish control, and, incorrectly, that the "second factor requires a showing that the subsidiaries are the alter ego of the parent[.]" (*Id.* at 29). In fact, the second factor of the test for control over documents does *not* require showing that the entities are "alter egos," *see, e.g.*, *SEC* v. *Credit Bancorp, Ltd.*, 194 F.R.D. 469, 473 (S.D.N.Y. 2000). Considering both parties' arguments, the Court concludes that the second factor favors Plaintiff.

### d.     Factor Three: Demonstrated Access

Plaintiff argues that Chargeurs' practical ability to obtain documents from Fitexin and Chargeurs Entoilage is shown primarily by two proffered facts: (i) Rousseau, an individual working closely on this litigation, is a Fitexin employee; and (ii) Chargeurs can obtain certain types of documents as a shareholder of Chargeurs Entoilage.  (Pl. Br. 23).  Specifically, Defait testified that Chargeurs can obtain the records and minutes of shareholder meetings as well as the decisions of the Fitexin supervisory board, and could hypothetically obtain documents from either Fitexin or Chargeurs Entoilage by threatening to replace the entity's president.  (Defait Tr. 99:14-104:25, 108:13-109:12; *see also* Pl. Reply 14).  Defait also testified that Chargeurs could obtain documents from Fitexin simply by asking its president or another employee for the documents.  (Defait Tr. 107:22-108:3, 109:2-12).

Defendants argue that Chargeurs does not have access "in the ordinary course of business" (Def. Opp. 29), a conclusion they seek to support by citing Defait's testimony that Chargeurs does not share a server with its subsidiaries (Defait Tr. 125:13-18).  Defendants point out as well that supervisory board decisions "and similar corporate document[s]" are publically available, so Chargeurs' ability to obtain those does not establish control.  (Def. Opp. 30).  Defendants conclude that Chargeurs would require a court order to access non-public documents.  (*Id.* at 29).

In the Court's view, while some of the record citations are equivocal, Plaintiff has the better argument overall.  Even if some of the categories of

documents that Chargeurs accesses were publically available, Plaintiff points out that Chargeurs receives these documents in consolidated form solely for the entities it "directly or indirectly" controls. (Dkt. #78-14 at 108, 146; *see also* Pl. Reply 13). Further, Defendants' argument as to the lack of a shared server fails to rebut an inference of access to documents in the ordinary course of business because sharing a server is but one of numerous means to effect such access. Accordingly, the third factor favors Plaintiff.

### e.  Factor Four: Agency Relationship

Finally, Defendants observe that no evidence in the record supports the finding of an agency relationship. (Def. Opp. 30). Plaintiff's opening brief was silent on the issue, and thus Plaintiff has waived an argument as to agency; the Court will not consider Plaintiff's submission in reply that Chargeurs' annual report contains language from which an agency relationship could be inferred. (Pl. Reply 15). Therefore, the Court concludes that the fourth factor favors Defendants.

In sum, three of the four factors in the *Sicav* test to assess Chargeurs' control over documents in the possession of Fitexin and Chargeurs Entoilage favor a finding of control. Combined with the Court's April 19, 2018 Order finding that Chargeurs exercises control over Lainière Textiles *through* Fitexin and Chargeurs Entoilage, the Court has little difficulty concluding that Chargeurs also exercises control over Fitexin and Chargeurs Entoilage. Plaintiff's motion to compel is granted.

## CONCLUSION

For the foregoing reasons, Plaintiff's motions to amend and to compel are GRANTED. Plaintiff's amended complaint is due on or before **November 19, 2018**, and Defendants' answers or pre-motion submissions are due within 21 days of the date of service. Separately, the parties are ORDERED to propose, within two weeks of the date of this Order, a brief, reasonable schedule for the completion of fact and expert discovery as to all parties that have been served in this case.

The Clerk of Court is directed to terminate the motions at docket entries 76 and 92.

SO ORDERED.

Dated:     November 1, 2018
           New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge